May it please the Court, Charles Rabinowitz appearing for Errol Price, the petitioner in this case. And I would like to reserve eight minutes, if I may, for rebuttal. You have a clock in front of you, and whatever is left over is yours. Okay, thanks. Hopefully there are two issues before this Court on the rehearing. One issue is, the first issue is, to what extent, if any, may this Court defer to the Director's position, which was not an adopted regulation and was not inconsistent with the language of the Longshore Act. And that's the deference issue. And I think it's clear under Chevron, and as Judge O'Scanlan had pointed out, that — Excuse me, counsel. Just that we're on the same page. You said there were two issues. Can you just tell us what the two issues are, as you say? Because I thought there were three issues. Okay. And I just want to make sure we're all on the same page. Okay. Well, there may be three issues. I hope there's at least two issues. The second issue is, assuming that there is no Chevron deference to the Director and that the deference should be what the courts refer to as Skidmore deference, which essentially is respect based on persuasiveness, the second issue is, what is the appropriate rate of interest that should apply on past due benefits to disabled maritime workers? Okay. Is there a third issue as well as to the continued validity of Roberts? I'd certainly be willing to address that. I wasn't aware. That's certainly on the table. I'm not trying to create an issue, but since we're sitting in bank, I just want to make sure we're all on the same page. Okay. Roberts, I'm certainly willing to address that issue. I'm prepared to address that issue as a third issue. Okay. You go ahead and argue as you wish. I just want to make sure we're on the same page. Okay. Thank you. We are. It would be helpful to me if you began with a summary of the way this agency operates. That may seem very elementary, but there's the Director, there's the board that the ALJ decisions, there's the board that ultimately decides things. And at what point, and I'm aware that there's a Supreme Court case saying that we don't defer to the board, although I'm a little baffled about why, and then in what guise does the Director take positions or in what guise did it take positions in this case? Well, in this particular case? Well, in general. In general, what does the Director do, and in this case, what did it do? Well, Mr. Boyle may be able to address that more accurately than I do. The Director is based in Washington, D.C., as I understand it. And they do have district offices around the country. Periodically, they do get involved in the long-short hearings for certain specific issues. Usually there's an issue called Section 8F relief, which is Section 9033 U.S.C. 908F. And that really doesn't affect the injured worker. It affects only what's called the special fund and whether the special fund takes over payments instead of the employer or not. And because the Director is essentially protecting the special fund, that's when the Director gets involved. But they usually don't get involved at the AOJ level. Sometimes they get involved at the board level. Usually, and a lot of times they'll just get the briefs in the Circuit Court of Appeals and not take a position. Which is what frequently happens. But in this case, they have taken a position. But before the agency, did they take a position before the board? Sometimes they do. Did they hear? They did not hear. So all we've got is their litigating position in this Court. That's correct. Their position is, as I indicated, is a litigating position in this Court. They say it was a longstanding administrative policy. It wasn't. The board issued a decision, I think it was 27 years ago in the Grant case, where this interest rate issue came up. The Director was involved in that case. And, in fact, the position they took in that case is the same position that I'm taking in this case, that the taxpayer rate should apply. And, unfortunately, they didn't win that issue. The board adopted the Federal judgment rate. And then that's the last time this issue has come before a court. One of the board members. Kennedy. Pardon me, Mr. Maroonovitz. You said it wasn't a longstanding practice. I've read, I thought I read somewhere that the Director had adopted this rule regarding section 1961 interest as part of a manual or procedure manual. Is that incorrect? I think they put it in the procedural manual. When did they do that? You know, I'm not sure. They said it was 1989, and I wouldn't quarrel with that. The ---- But did they have any option? This is the way I don't understand why the board is not in the picture here. Presumably, they did that because they took their shot at the board. The board decided otherwise. I gather they're bound by the board. That's correct. That's correct. So they had no option but to do that. That's absolutely right. It wasn't really reflecting their view of anything in terms of expertise. That's exactly right. It's very bizarre. That's exactly right. And the ---- one of the reasons the board gave for affirming the 28 U.S.C. 1961 rate is that no circuit court has ever overruled it. Well, the answer to that is this is the first time this has come before the circuit court that I'm aware of. No circuit court has ever sustained that rate either. And this is the first time that the ---- since 1984 that the director has taken a position on this issue. It would help me in sort of putting these three issues together in my mind to understand a little bit more about how the scheme works. And I'm afraid I just don't have a clear picture. Let's say a ---- you represent Mr. Price, right? Correct. He's a stevedore? Excuse me? What is he? He was a longshoreman. Longshoreman, right. So he's a longshoreman. And so he gets injured. And let's say that the employer decides, yes, he's injured. We're going to give him compensation. How does that work? Is it a lump sum? Is it a yearly award that gets paid for? How does that work? What happened is I refer to him as Bud Price. That's how he goes. He got hurt in October of 1991. He was off work for a time with neck and low back problems. The employer paid him what they thought was a correct average weekly wage. So they paid him every two weeks. And then after about three months, they said, we're not paying you anymore. And they sent a letter or a form to the Department of Labor in Seattle, which is the district office for the northwest part of the country. And they said, we're not paying him. And then Mr. Price came to me and said, I'm still hurt. I need some help. So I filed a claim for him to try to get this resolved. Unfortunately, we did not get that resolved, and we did not get a hearing on the case until 1999 for some unusual reasons in that particular case. The judge did not, the administrative law judge, then wrote a decision in October of 2000. He did not, we did not agree with the average weekly wage. What happened is Mr. Price finally retired in 1998, in July of 1998. He simply could not work anymore. And there was an issue as to whether that was due to continuing work exposures, so that he had a new injury in July of 1998, or whether it was a natural progression of the original injury in 1991. So there was a fight between the employers as to who was going to be responsible for the 1998 injury, and what the average weekly wage was in 1991 and in 1998. In 1998, neither employer paid him anything. So finally, we got a decision in October of 2000. The Homeport Insurance Company was not, which was the second workers' compensation carrier in 1998, was not happy with getting stuck with the claim. We were not happy with the average weekly wage that the administrative law judge imposed on Mr. Price for either 1998 or 1991. So we took a, so appeals went to the Benefits Review Board. The Benefits Review Board straightened out the 1998 average weekly wage and left Homeport as the responsible carrier for the 1998 inability to work. That then went, both sides then appealed to this Court, and this Court affirmed the responsibility issue, and then straightened out the average weekly wage for the appropriate rate. So that's how the director. So had things gone as you think they should have gone or as it's now been determined they should have gone, the payments would have started in 1991 and continued until his retirement or until his injury ended, right? Until he was medically stationary and had returned to work. And then there would be an award for permanent partial disability. Okay. And the award goes up every year? Only a permanent total disability award goes up every year. A permanent partial one does not. So how does the cap, the Roberts issue operate? Okay. The way the cap would operate is a longshoreman or any maritime worker is entitled to two-thirds of his average weekly wage up to a maximum, which is twice the national average weekly wage. So if a longshoreman, and some of them walking bosses and supervisors, can make as much as $2,500 or $3,000 a week, but the maximum right now, I think it was, it's around $1,260, something like 1,266. So somebody who's making $2,500 a week is not going to get two-thirds of his average weekly wage. It's going to be up to a maximum of 1,266 as of today, something in that vicinity. And what's the dispute on that point? Excuse me? What is the dispute on the Roberts case? On the Roberts case, the once a – well, what happens is the way it normally works under the Act is the employer pays the compensation to the injured worker. And subsequently, there may be a dispute about permanent disability or permanent total disability, and then an award is entered at a later date by an administrative law judge. And under Section 60 of the Act, it says that the award is the maximum compensation rate applies to those newly awarded compensation. And the question is, what does newly awarded compensation, what does newly awarded mean? Does it mean the date that the worker gets injured, or does it mean the date that the worker is awarded compensation by an administrative law judge? Or a district director can also award it if there's a stipulation. Well, I think the question is, or at least I understand the question to be, how does it apply in this case? In this case, Mr. Price got hurt in July of 1998. So there's a maximum compensation rate. I'm sorry. He first got hurt in 91, right? He got hurt in 91. He continued to work. And then in 1998 – And did the cap kick in to any of those years? Yes. The cap would have kicked in in 1991. In other words, he did not get – I mean, when I say kicked in, was he one of the kind of worker that had a high enough salary where the cap mattered? Right. In 1991, he did not get two-thirds of his average weekly wage. Because he came up against the cap. Because he came up against the cap. And he came up against the 1991 cap. Correct. And then the cap kept going up. Yes. There's a cost of living increase every October 1 that's based on an increase in the national average weekly wage. And so it keeps going up each year. And the question is, which cap applies? Does the cap – But 1998's not relevant, right? It would be 91 or 2000. No, 1998 would not be relevant. Because in 1990 – well, I – you know, I take that back. You said 98. That's what confused me. In 1998, I think he was up against the cap as well. And the – and he would have gotten a – I have to go back on this thing a little bit. That's not in this case at this point, right? Excuse me? My understanding is the 1998 award is not in this case at this point. The award for the period after 98. I'm not sure if it is. But in any event, the 1991 cap certainly is in effect. Right. And in 1991, the – he got an award. He was – he was initially paid compensation voluntarily by the employer in 1991, in October, when he first got hurt. He doesn't get an award from the administrative law judge until 2000. So the question is, which cap applies, 2000 or 1991? And the way – Well, why would that even apply? Because – I mean, this is – just shows how complicated it would be. Because in 1991, he got something, but not what you thought he should get. Correct. In 98, he got something, but not what you thought he should get. Right. So – or in 2000, I mean. So if you were to follow your logic through, it wouldn't be 2000 either. It would be 2007. Well, no – I thought it was when the award was first given. When is the award first given? The award was given in October of 2000. So even though the award got adjusted later on by the Benefits Review Board and by this Court – Your position is that the date is not the date he was injured, but the date the award was given. That's what the statute says. Well, I understood that. I'm trying to understand how it applies to your case. Well, we – Or what it means. I mean, he was paid all along, right? Well, he was paid initially, correct. He was paid initially. But then how long was he when he wasn't paid? They cut him off. I'm not sure whether they cut him off in January of 1992 or November of 1992. And then when was he next paid? He – well, the – that rate was finally adjusted by this Court in 2004. So he actually received additional compensation in May of 2004 based on this Court's decision. But I thought he wasn't paid from – he said they stopped paying him, you said. Excuse me? You said they stopped paying him. They stopped paying him in January of 1992. And then when did they next resume paying him? They next resumed paying him, I believe, it was finally – when that rate was finally adjusted by this Court in May of 2004, when it issued a decision and revised that 1991 rate. That doesn't make sense. But the first time he gets awarded compensation, the first award was in October of 2000. That's when the administrative law judge awarded him compensation. An issue is whether it's the date of the award or the date of the injury or first payment. The date of voluntary payment, right, or the date of – whether newly awarded means the date you receive some payment voluntarily from the employer or when you receive an award of compensation from the administrative law judge. It's not injury, because if you have an injury and then the compensation happens over several years, the cap would go up every year, right? It doesn't. It gets stuck at the original rate? He's stuck at the original cap rate. That's correct. And what this Court held in Roberts – Even if the employer is paying voluntarily? That's correct. That's what the courts have held. And this Court – what this Court held in Roberts – So just so I get this to my mind. So what happens is if an employee is injured in 91 and the employer says, we're liable, you know, there's no dispute, fully covered, we will pay everything we owe, as the statute requires, he'd get X dollars for – until at some point in time, until he stabilizes. Correct. Whereas under your view, what happens if he goes and gets an award, and let's say there's another employer right next to him who's in the same situation who doesn't get paid and gets an award later, he would get an award for all the higher level, the cap at the time that the award is entered? Well, that's not the way the court – that's not the way the courts – But that's your position. That's my position. That's correct. That's your position. Okay. I still don't understand why, if your position is that the question is newly awarded compensation, why you don't have to say if he's now awarded more, then for that more, it's the other one, it's the later one that counts. I mean, if this, as I understand it, got a much smaller award, so he's awarded compensation, but not this compensation in 2000. In 2007, he was awarded more compensation. Well, in 2004, you mean. 2004. Right. Well, the statute says newly awarded compensation. Compensation. Right, but compensation. In other words, I'm just trying to follow through the logic of your position. I mean, if there's this compensation and then there's more compensation, so he was newly awarded more compensation. Well, the way I read the statute is that the cap applies, the maximum rate applies to those newly awarded compensation. And Mr. Price was newly awarded compensation in October of 2000. Then the position – this goes back to the position, as I understand it, the position of somebody, whether it's the director or the review board or who, and that's what I want to know, is that during such period means not the period that the compensation was awarded, but the period for which it was awarded. Correct. That's their basic position. It has nothing to do with the newly awarded language. Well, that's their position, but I think – But who's the they, first of all? The director. Where? In this Court or elsewhere? Well, I think it's in this Court, and I think it's their position around the country that that's – Meaning what? When they do what? I'm trying to get back to the deference issue. The board has – the Benefits Review Board has taken this position. That's the position the Benefits Review Board has. Okay. The director has taken this position before the Benefits Review Board or when it's doing something else, like enforcing some requirement separate from the Benefits Review Board, or what? Or there's no regulation, right? I think it's taking the same position. I don't know if it was before – I don't know if the director participated before the Benefits Review Board in the Raposki case, which was the precursor to Roberts. The – but the director is taking that same position as a litigating position on this Section 6C issue, 33 U.S.C. Litigating position in court? In court, correct. But what about not in court? And what about – if it's going – I mean, we know from the case law now that the question is what is it doing in its administrative expertise? I don't think it's doing anything in its administrative expertise. I don't – it has not passed a regulation. It has not, as far as I know, it has not proposed one. It has not solicited comments from longshore unions or industry. So your ultimate position is we ignore what the director says and we also review what the board says because of this footnote in the Supreme Court opinion before Chevron, written before Chevron. Excuse me. I didn't – The footnote in the Supreme Court opinion that says that we don't owe deference to the board was before Chevron and Meade and all of that. That was in the Potomac case, correct. Right. Okay. So even though the board is the adjudicatory agency, makes the rule – makes the legal decisions, those legal decisions are binding on the agency, they don't count for all purposes. That's correct. That's correct. Even though the board – the Supreme Court said that before Chevron. That's correct. And before Meade. But we're bound by it as your position. That's correct. Mr. Goodowitz, I wonder if I could ask you what your position is on the compound interest. Why are you entitled to compound interest? Well, I think I'd much prefer the taxpayer rate. The compound interest rate is simply because the board followed 28 U.S.C. section 1961, and 1961 does require compound interest annually. From when? From when it would be from the date of the – when the payment – well, the interest would be from the date when the payment was due, and then it would be compounded annually. That's how the statute requires it. If you get the taxpayer rate, then you don't – you're not claiming compound interest? No, I don't know if the – I was thinking about that on the way over this morning. And I'm not sure if the taxpayer rate compounds quarterly or compounds annually. I'm just not sure about that. The taxpayer rate is essentially the Federal short-term rate plus 3 percent. Okay. Let me ask you a question, if I could. You said something that I may have misunderstood with respect to whether the cap rises. Let's take someone who has permanent total disability. Correct. So he's getting periodic payments over the period of his coverage. So this will go on for years. Correct. And the cap gets readjusted every year. Does the readjusted cap apply to his periodic payments? Yes. So his periodic payments for someone who is permanently and totally disabled, that cap goes up every year. That's correct. But you're – I misunderstood an answer then. But as to someone who's only partially permanently, the cap never goes up. Is that right? The rate never goes up. Correct. His rate stays the same. Does the cap go up? Well, the cap goes up, but it doesn't apply to permanent partial disability. So that is to say he just gets his calculation, whatever it is. That's correct. And if permanent partial, I guess, bumps up against the cap, probably it's not going to happen very often because it's only partial. It doesn't happen very often, but it can. The cap goes up. The cap doesn't apply. At the lower rate, the cap goes up. I don't think the permanent partial disability rate would go up. But does the cap go up? Well, every year the cap does go up, at least there – Maybe I'm not saying my – The benefits would not go up. No. Let me make sure we're understanding ourselves. We're now talking permanent partial. Correct. Let's have the rare case in which the permanent partial disability is so substantial that the award does bump up against the cap and is reduced because of it. And let's say that partial disability continues. It's permanent, as they had predicted. And the cap goes up over the years. Does the award go up to the extent that the cap is lifted, even though the base award never changes? The answer is no. Because? Because the increase only applies to permanent total, not to permanent partial. No. You don't say increase. You mean increase what? The increase in the cap. The increase in the compensation rate due to the increase in the cost of living adjustment. Can I ask you one more question? You just said two things, that the compensation doesn't go up or the cap doesn't go up. You know, say one or the other. But if you say both, you've really just said nothing at all. Okay. And let me rephrase it. Did you hear Judge Fletcher's question? I mean. Let me rephrase it, because I think we're on the same page. No, we're on different pages. Okay. I can assure you. I'll try to get back on the same page. We're on different pages. I'll try to get back on the same page. Let's say he's getting $100, okay, and the cap is 90, right? And then the next year, the cap goes up to 100. Does the award go up to 100, or does it stay at 90? If it's a permanent total award, it goes up to 100. If it's a permanent. We're not talking a permanent total. We've disposed of that. Okay? Forget it ever existed. The question had to do with partial, permanent partial, right? Okay? Correct. Permanent total, you've told us. Permanent partial does not go up. Does not go up. So he gets so if he gets $90, the cap, I'm sorry. He's supposed to get $100. The cap is 90. He gets 90 in the first year. In the second year, the cap has gone up to 100. The award stays at 90. Correct. Correct. Counsel, I notice that both you and Mr. Dudry on behalf of the insurance company agree that we should not apply Chevron, but we should apply Skidmore. But of course, each of you has a different idea as to the outcome if we apply Skidmore. I'd like to have your thoughts on what Skidmore does for your position. Well, Skidmore basically says the director is entitled to respect based on the persuasiveness of its position. And in this case, there's at least three reasons, maybe four, why the director's position is not persuasive. Number one is why is he entitled to even Skidmore? Well, what's the answer? I'd like to hear the answer. What are the four? Can you list the four? Well, real quickly, number one, they took a totally different position 27 years ago, and nothing has changed to cause them to change its position in 27 years. In fact, if anything has changed, the Treasury bill rate is not really a – is really not a market rate anymore. The Federal Reserve has a policy of trying to keep those rates as low as possible, and it really can be argued that the rate is artificially deflated. So the judgment rate is really not a market rate. Secondly, the policy that this Court had in 1990 in the case of Foundation Constructors v. Director in imposing interest on past due benefits was to compensate the injured worker, the disabled worker, for, you know, for what their losses were waiting for their benefits. And the rate yesterday, I think, was 0.09 percent on the Treasury bill rate, the option price. And that is not a realistic rate to compensate somebody for having to borrow money or to make other arrangements for money while they're waiting for an award. Nobody can get that kind of a rate. And the third reason is that the Black Lung Act has a provision in it that actually requires interest to the Trust Disability Fund based on the taxpayer rate. Kennedy. So it sort of cuts against you, doesn't it? I mean, the Congress puts in that specific provision as to the Black Lung Act. I'll get it out. And they don't in this case. It sort of cuts against you. And doesn't that money come out of taxpayer funds? That does come out of taxpayer funds. So that's a good reason, all right. But then what they did is they passed the Director passed a regulation for the minors when they get paid back that they get paid back on the taxpayer rate. And there's no logic to having disabled workers under one Federal remedial statute be paid a different rate than workers under another Federal remedial statute. Well, what about the fact that Congress passes a provision that specifically deals with it? Why isn't that a sufficient reason to treat them differently? That was only for the Trust Disability Fund. It wasn't for the worker. And then they passed a regulation for the worker. And in fact, I think, I'm just using my logic on this, that in 1984, when the Director took the position that the taxpayer rate should apply to maritime workers, I think it was based on the fact that it was also applying to the black lung workers. And the other thing is, I know my time is up. Your time is up. If I can have one more minute on this. You can take it now or you can take it for rebuttal. Okay. Well, maybe I will save it for rebuttal. Very good. Thank you. Good morning, Your Honors. May it please the Court. Matthew Boyle on behalf of the Director. I will try to talk about the 6C issue a little bit and try to straighten out caps versus compensation rates going up and things like that. They sort of play off each other in a way, don't they? Because prejudgment interest is in a way of making things come forward to the present. And in some ways, so does a cap, right? Yes, Your Honor, to a certain extent. The way the cap works is every year the Secretary figures out what the national average weekly wage is. The maximum rate is set at twice that national average weekly wage. So when a person gets injured, the first step is under Section 10, which tells us that a worker's compensation rate is two-thirds of his average weekly wage, which generally speaking is the wages that he's earned over the year prior to the injury. The second step is you look at Section 8. And Section 8 tells you for a worker like Mr. Price, who was found to be temporarily totally disabled, you take two-thirds of that average weekly wage, and that is his calculated compensation rate. Now, the only time that Section 6 comes into play is when his calculated compensation rate, the two-thirds of his average weekly wage, is more than twice the national average weekly wage for that same year. The national average weekly wage, the maximum rate being twice the national average weekly wage. Now, there is the one of the disputes here, obviously, is when is the claimant newly awarded compensation. And our position is that because Section 10 and Section 8 tie compensation to the date of the injury, you have to use the date of the injury for that year's maximum rate as well, so that you're comparing apples to apples. You're comparing the workers' wages from 1992 to the national average weekly wage from 1992, as opposed to the workers' wages from 1992 to a cap that exists based on wages. The date of the injury rate is the employer can pay for one year and stop. It doesn't have to be paid other than initially. If it's an award, then it has to be paid from then on, right? Yes, Rob. Can you ask? I'd like to ask the same question I asked your adversary, and I want to make sure that I understood the answer. The reason I'm puzzling is that it seems an illogical answer. We've just heard that if it's a permanent and total disability and that award, when it's first awarded, even as calculated back at the time of the injury as you would do it, runs up against the cap. But the payment keeps coming because it's a permanent injury, and two years later the cap is now high enough you can give them the full two-thirds. I gather the cap allows then the full two-thirds as soon as the cap is high enough. Do you agree with that? Yes, sir. But then the puzzling thing is, why does that same principle not apply if you have someone who has partial permanent disability that runs up against the cap? I understand that may not happen very often, but it could. The answer we got is, if the cap rises, even though you're continuing to make payments because it's a permanent disability, simply because it's partial, the fact that the cap goes up doesn't allow the award to go up. Is that correct? It is correct, Your Honor. And the reason for that. And what's the rationale for that? The reason for that is because there are two parts of Section 6C. The first one says that you get the maximum rate if you're newly awarded compensation in a given year. You get that year's maximum compensation rate. The second says that if you are currently receiving compensation for either death or permanent total disability, you get that year's compensation rate. So because a permanently totally disabled person, even if injured in 1992, would still be currently receiving compensation this year, his compensation rate would go up in accordance with that. I see. So Subsection C applies to those, but it doesn't apply then to someone who has partial disability. Correct, Your Honor. So it's not just partially disabled. It's anybody who does not have death or permanent total disability. So it can be a temporarily totally disabled person, which Mr. Price was adjudicated to be here. Could you tell me what the source of the – I mean, this is at least an ambiguous provision. What is the source of the interpretation that says what you're saying? It's the director, it's the board, it's – Of Section 6C, Your Honor? Yes. Yes, Your Honor. This issue never came up anywhere until, I believe, 2005 in a case before the board called Raposki. And in that case, we took the position that we were – Who's we? The director, Your Honor. Okay. I mean, you participated in that case as what? As the administrator called the director, Your Honor. Because the director – going back to your earlier question, the reason the courts have not given deference to the board and have given it to the director is because they generally don't give deference to those who are not administrators of the act. The director is considered the administrator. Well, in other statutory schemes, that isn't so. I mean, we give deference to the Board of Immigration Appeals, we give deference to the National Labor Relations Board, we give deference to the Securities and Exchange Commission in their adjudicatory role. And this one seems to be different for some reason. It is, Your Honor. And I think the reason for that is because I think the – in some cases, the adjudicator and the administrator are one and the same. In this case, they're not. The adjudicator is the board and the administrator is the director. But back to your earlier question, we took the position before the board that newly awarded compensation was based on the date of the injury rather than the dates. In a sort of amicus capacity? Were you a party before the board? We are a party before the board, Your Honor. And in any case, you just – Yes. In every case. Were you in this case? In this case, we did not participate before the board in this case, Your Honor, because the interest rate had been settled 27 years ago under Section 6C. So you're not really a party. You can be a party when you want to be a party. Correct, Your Honor. You're more like an amicus. I mean, you're not really – the adjudication is between the employee and the employer and the insurance companies, and you come in when you feel like it. Is that right? Generally, yes. But as Mr. Rabinowitz mentioned, there is a second injury fund under Section 8F that we administer, and when we come in on that, we are considered a party as well. Assuming the 28 U.S.C. 1961 rate applies, which is what I think you're arguing for, I don't understand the rationale for why it should be simple instead of compound. Your Honor, the rationale is that 28 U.S.C. 1961 applies compound interest for pre-judgment interest. Yes, so? Pardon me? I'm sorry. Go ahead. And the courts have generally looked in a district court setting to an abuse of discretion standard, regardless of what pre-judgment interest. It's a discretionary call in the district court, right? I'm sorry. In what?  call. Correct, Your Honor. It looks like in this case, they just say we never award it, and there was no exercise of discretion one way or the other. They just said we don't give compound interest, end of story. There was no rationale one way or the other. Right, Your Honor. I agree that using an abuse of discretion standard is somewhat strange here because we have effectively eliminated our discretion. But I think that's what brings us back to the deference standards. Why shouldn't we go back and say, look, we'll give deference, but exercise discretion. Tell us why you did. Tell us why you didn't. In this particular case, Your Honor? Well, in this case and maybe all other cases. Well, I think the rationale, Your Honor, is what I just told you, that the section 1961 compounds interest for post-judgment cases, and we're dealing with pre-judgment interest, which lends itself under many cases to using simple interest. Is this controlled by your decision in Santos? It is. It certainly is with respect to the rate allowed by Federal district courts. But does it also extend to the issue whether it should be compound or simple? Yes, Your Honor. In Santos. In Santos, the board revisited its decision in Grant because in Grant they had said we're going to use the 1961 rate, but they didn't specify compound or simple. In Santos, that issue came up and the board said. Okay. And you've been following that since 1989. Correct, Your Honor. I just want to make sure I understand the difference between simple and compound. When you talk about simple interest, it doesn't compound at all. Correct, Your Honor. So if you have a $100 award, there's whatever percent, let's say 10 percent in the first year, and that doesn't get added at all. It just stays there. In the second year, it's still 10 percent on the original $100. Correct, Your Honor. In compound, you're earning interest on the interest. I understand what it means. When you say not compound, so it's not like it's compounded once a year or once every year. It's never compounded. Correct, Your Honor. Let me ask you why the reason I pardon my somewhat sarcastic interruption. Your rationale for why you don't apply 1961B, that is to say compounding yearly, even though you apply 1961A, which is the rate for post-judgment interest in Federal Courts, you say, well, but this is not post-judgment, it's prejudgment. But, of course, if that's the rationale, you wouldn't apply 1961 at all. Correct? The rationale behind applying 1961, Your Honor, was that prior to applying 1961, the Director applied a flat 6 percent interest rate. No, no. I'll be taking my point. It seems to me that if you're going to take 1961, you've already gotten past the question of whether or not you're going to apply a post-judgment rule, which is 1961, to a prejudgment case. But now you've taken the post-judgment rule, applied to a prejudgment case, and you've applied only part of it. You've only applied 1961A and you've not compounded it as 1961B would do. Correct, Your Honor. And the reason we did that is because we didn't – we did not adopt 1961. What we did was adopt the rate that's set forth in 1961, and we differentiated it based on the fact that we were dealing with prejudgment of interest and the statute itself exclusively with post-judgment interest. Yeah. Okay. That's a matter of confidence. Can I finish off? The question then is, you've adopted what now turns out to be an extremely stingy rate of interest and you refuse to compound it. Why should we think that that's the right rate of interest when I gather we now have an open playing field? Why is that the better rate of interest than the taxpayer rate? Well, the taxpayer rate in this case, Your Honor, would have given Mr. Price 9 percent interest compounding, which frankly I don't think is realistic in anybody's experience, certainly not in mine. My savings account rate, high-yield savings account rate, is earning less than 1 percent at this point. The point of using the 1961 rate is that it fluctuates with interest rates and gives a good, I think, approximation that we can cover all claimants and all employers with of what they would earn on the money. Well, that's a pretty good rationale, but it doesn't explain why not compound. I take it your bank account does compound, doesn't it? Yes. If we're going with that analogy. So what's the rationale for not compounding? I mean, you've given us a pretty good rationale for using one interest rate or another. I mean, I don't know if I buy it or not, but it's certainly a good rationale. But isn't the logic of the rationale that we've got to compound? Using the Boyle bank account analog? You're Boyle, right? Yes, I am Boyle. Okay, well, so using the Boyle bank account rationale, why isn't that a call for compounding? But perhaps the bank account was not a great analogy. It's your pick. I know, I know. I mean, okay, pick something better. Pick something else that works for you. Pick your own example. I think what it comes down to is... No, no, go ahead. I obviously, I don't... You can't think of anything, can you? No, I can't. You can't really think of something that's a realistic interest rate that doesn't compound. It's beyond current modern experience, right? Why isn't that the definition of something we should not follow, even if we apply Chevron deference? Well, because if you apply Chevron deference... Of course you don't, but... What is your position ultimately about that? Do we apply Chevron deference or not? Judge Scanlon earlier characterized your position as being that we don't. Is that right? No, that was not my position, Your Honor. That was one of the other parties' positions. That was the insurance company. Insurance. My position, Your Honor, is that, frankly, the Supreme Court law on deference I find quite confusing. But I think there is the door is open in this case for deference on our interest rate position to either Chevron or Skidmore. In what context did the director take an interest rate position? The way it has worked, Your Honor, we've had this in our procedural manual for over 20 years. We do not have a notice in common. Because that's what the board said or just because? Frankly, Your Honor, we don't have the records. My assumption is that... Could be a typo. No, Your Honor. It's been in there consistently every year. I've seen typos go on for years. Doesn't it get you a smack up against the problem that Silberman pointed out? I mean, it's much easier to give deference when you have a rationale to defer to. In this case, there's no rationale. How do we defer to something, no matter whether you call it Skidmore or Chevron or anything else? How do you defer to something that could be a typo? Your Honor, the only question under Chevron is whether our position is a reasonable way to ensure that the value of the claimant's compensation is not diminished. Frankly... You can't come up with a single real-world example that doesn't compound. I also can't come up with a single real-world example where a person would get 9 percent compounded daily under a tax underpayment rate, Your Honor. That's a good reason not to go with a taxpayer rate. It still doesn't answer the compounding question. That's true, Your Honor. I think you could certainly argue that using the compound interest rate is also a reasonable alternative, but the question under the deference law is not whether there are other reasonable alternatives. Well, your job is to tell us why this position is reasonable. And as just Silberman's question suggested, it's a lot easier to find reasonableness when we actually think the agency has thought about it and come up with a reason. In this case, you tell us there is no such animal. There was no decision by the --. All we have is a printed page that for all we know was a mistake. I didn't think that a procedural manual was binding anyway, that that was --. A procedural manual is just to tell the employees in the agency how to go about doing things. And I think that's a reasonable alternative.    And I think it's a reasonable alternative because it doesn't generally establish a policy for the world at large. I would disagree with that, Your Honor. And I think a good analogy to that is this Court's Tablata case in which the Federal Bureau of Prisons had a program statement which was an internal guideline on how to properly go about calculating good time credits for prisoners. And the Court deferred to the agency's program statement, its internal guideline, largely because it had stuck with that guideline for over 16 years, just as the Director has stuck with its internal guideline for over 20. Equally important, the Court said that even though Mr. Tablata, the prisoner in that case, was going to defer to the agency under Skidmore anyway, and they accepted the agency's interpretation of that case. But what -- In this case, we just have the manual. We have no explanation. Isn't that different? I mean, when the agency has opined even if it's an internal guideline and there's some rationale behind it, that's something that we can say, well, the agency did consider interpretative statute. But we've always done it this way. It's not the same as we've engaged in a reasoned analysis. Your Honor, I believe the program statement in Tablata was simply, this is how we're going to do it. I don't know that there was no discussion in the case. Well, maybe we should revisit that. Mr. Boyle, do you – are you splitting time? I am, Your Honor. I don't – I see three lawyers, and I haven't been informed of any split. Are you splitting time? Mr. Boyle, may I ask you one question before you leave? Certainly, Your Honor. There's no dispute that some interest is owed under this law? That's correct, Your Honor. No one has said that. What's the authority for that? The – well, the – there is nothing in the statute about that, Your Honor. The director a long time ago believed that in order to make sure that the value of a claimant's compensation was not diminished, that interest was applicable. And all of the courts that – So he sort of pulled that one out of his hat without any statutory authority. Correct, Your Honor. And all of the courts affirm that. Thank you. Okay. Please, the Court. John Dudrey for Homeport Insurance, one of the two insurers in the case. To answer the last question first, and my ten-point outline is – it's hopeless at this point – the case law, there are two – three cases in the Ninth Circuit. First, the Foundation Constructors case. Then the Sproul case. And then more recently, the Matulik case. The ancestor of all of those was a pre-Chevron Fifth Circuit decision, the Wedemeyer case. It's cited in Eagle Pacific's red brief. And that was the director coming in and telling the Fifth Circuit, and it was a test case on an issue of interest. We think this should be done so that the compensation value of the award isn't diminished by time. In Chevron terms, or in Skidmore terms, I think this has to be seen as the kind of gap in the statute that the general authority, which is in Section 39 of the Act, to administer and to issue rules would apply. In the absence of any rulemaking, I think you can't get to Chevron. You get to Skidmore and Mead as a consistent interpretation. But that's been through the case law at the court of appeals level in the cases I just mentioned. Many of the earlier questions are addressed in a Supreme Court decision that nobody managed to cite to the court until now. And it's called direct. Did you find it this morning? I found it as I was getting ready for this argument. And I'll cite it and leave it at that. Was it this morning? No. And why is it that you didn't send it in earlier so we could have a look at it? I didn't notice until I looked through the tables of contents that I couldn't say, and you'll find it at page such and such of this, that, or the other brief. And you discovered that this morning? Yesterday afternoon. And you didn't send it in then because? Because I was in San Francisco and my office is in Portland, and I'm not sure if I found it. And you don't have a BlackBerry or an iPhone. I'm primitive in that regard. Anyway, could you tell us what the case is? Yes. It's Director v. Newport News Shipbuilding. It was cited. And it's 514 U.S. 122. It describes the director's responsibilities, and it does address a specific question Judge Berzon raised. The whole system is a system for resolving disputes between private parties, the employers and their employees, with government assistance and management. But the director is not representing anybody before the board. Is that right? No. Except in the special case. The way — I agree with Mr. Rabinowitz and Mr. Boyle's description. By regulation, the director is designated a party in interest and can appear in the board at any time. We usually don't see them at the hearing level unless it's a special fund Section 98F issue, which I think has been agreed already. One of the other issues, then, the concern was raised about compounding. And the — I'm sorry. I'm still listening for what relevance that case has to what we're talking about. Oh, I'm sorry. Well, it describes the director's duties in some detail. Why don't you tell us what the relevance is, and then tell us why. All right. Okay. What point are you trying to make with that case? Well, the four broad areas of responsibility for the director is responsive to questions. The point you're trying to make with that. What is the point you're trying to make? Well, among others is supervising, administering, and making rules and regulations, which has not been done in either of the interest rate issue or the maximum rate issue. So you have to rely, given there's been no action with congressional authority to do so, I think you have to look at the other types of deference. And the fact that the director — I'm still waiting for the point you're trying to make. Which issue and what proposition are you trying to support with this case? Just so I understand where you're getting. I mean, you meander. I'm sorry. What proposition are you trying to support? I gather your proposition is they're not entitled to Chevron deference. I believe because they did not act in this manner that is one of their responsibilities, Your Honor. That is the point. They did not go through rulemaking. They did not take the kind of action. They're not entitled to Chevron deference on what? They're not entitled to Chevron deference on either the interest issue or the maximum rate issue. So you think no interest? Pardon me? Your position is they get no interest? Oh, no, no, no. I think they're entitled to Skidmore and Mead respect for this. And interest is established by the case law. And the judge of Scanlon raised one of the decisions. I'm sorry. I'm still trying to understand. What do they not get deference for? So they get deference for imposing interest. You're agreeing to that? They get Skidmore respect or deference. The cases refer to it both ways. They have to have a persuasive case for it. Is there interpretation A? Is it a reasonable interpretation that persuades the court? Chevron is, is it a reasonable interpretation among possible alternatives? If it's okay, if it's reasonable, it will be accepted under Chevron. I don't think you get to that in either of these issues. I have no idea what you're saying. Well. I'm totally confused. Skidmore. I mean, maybe everybody else got it, but I could just completely miss. All right. Is your position they get interest or they don't get interest? They do get interest. Absolutely. Okay. Fine. So you agree with that. And interest, what's your position on interest? That the 1916. Are they compounded or non-compounded? Well, I was going to mention the Santos decision, which. Why don't you tell us what your position is and then. Judge O'Scanlan, it's a case-specific issue. In Santos, the board indicated some cases that it felt set the parameters of the issue. But we apparently don't know any difference to the board. So why are we worrying about the board? Well, because the, it's the only rule that's out there at this point. And that's the, typically, the district courts have compounded prejudgment interest if there's a big disparity between the 1961 rate and the rates over the period of time in question, from the injury or the, when damages were. But we don't know the difference to the board. And the director has only been following the board, essentially, hasn't really said anything on its own behalf. Is that right? No. Any explanation? There has not been anything that I'm aware of other than the Santos case involving compounding. And if the playing field is clear, as was commented. And with regard to the director's position before this Court, for one thing, it was an error because it took the position that there was another provision of the statute that's filled in for this, and now they admit that isn't true. So isn't that right? The penalty provisions don't have any, don't have anything to do with this. Right. Right. And that was the basis, or at least one of the bases, for the director's position before this Court. So even if you were otherwise inclined to give any deference to the position? Well, the goal of it, the penalty goal is to make sure that awards get paid quickly or to outset that compensation be paid quickly or be denied right away. The goal of interest is to find a measure that makes the award full. So what I'm saying is there seems to be no basis for giving any deference to the director or to the board with regard to the compounding issue. Is that right? Any deference? Skidmore or any other kind? No. If the director hasn't even argued or adopted Santos in any way, then I think it is a question that's coming before the Court and before no other Court with no position taken by the director. And what is the view do you think we should take on the compounding issue? What do you suggest? We don't owe any deference to the director. So your view is? Follow Santos. Take a look at it. And if the Court thinks it's the right rule, the Court should say we think this is the right rule, and now it's the Ninth Circuit's rule. Okay. And if we don't think it's the right rule, what should we say then? I don't know. I mean, what's your client's position? You're here representing a client. I mean, what are you arguing? You're not a law professor lecturing a class. Law professor. But what on behalf of your client, you know, this is going to be dollars and cents out of your client's pocket. So when you stand there, how do you earn your, what your client is, your fee on behalf of your client? What position do you take before this Court as to what, how we should rule on the compounding issue? Ordinarily, no compounding. No. What do you think we should? Not ordinarily. In the case involving your client and the money your client is going to pay out, what position do you take? I'd take the Ninth Circuit's position in Admiralty cases, Your Honor, cited in Eagle Pacific's brief. You use the interest rate at the time of the judgment, and that goes all the way back to the time when damages were incurred. That is the Ninth Circuit's default rule, Western Pacific Fisheries v. S.S. President Grant. It's cited in Eagle Pacific's brief. That's different from Santos, but it's a rule, it's the Ninth Circuit's rule, and it's a different rule. Is that compounded? That's not part of the rule. But remember, it's a default rule, Your Honor. And that's what Santos is, too. I think those are the best rules, and they have authority from the Board and from the Ninth Circuit. What do you mean by default rule? Well, if you can show some reason why that shouldn't be the rule, then you get to argue that the judges should be, it should be compounded. And what about the fact that this case is 20 years old? Is that a reason? It is. And it's the argument here below wasn't it should be applied, it should apply instead of Grant. It was just Grant's all wrong and we should use a different rate. And that's what's been presented here to the Court. I was going to save some time for Mr. Metz if there aren't any more questions. All right. You've got 25 seconds. Yep. Well, anyway, if there aren't any further questions, I'm finished and will yield the floor. Good morning, Your Honors. May it please the Court. My name is Russell Metz. I represent Eagle Pacific Insurance Company and one of the employers, or the employer in this case, SSA. And our position is that this Court should give Chevron deference to the Director's position on the interest question. And I'm ready to take any questions you might have on that because I suspect there may be some. And on the maximum compensation rate, it's our position that the Court decided that issue correctly in Roberts. And it's not a matter of deference owed to the Director's position in that particular instance. If we were to disagree and say that we should apply Skidmore deference, could you still prevail? It's our expectation that we would prevail because we do see that the Director's position in the interest question, albeit somewhat muddled at this point, and I don't mean to cast aspersions on the argument, but it is. Is that a compliment? Muddled? I know. I mean, it's hard to say muddled and not cast aspersions. Well, we would like a bright line demarcated. What sense does it make? What sense does a really low interest with no compounding rule make? It doesn't exist anywhere in the civilized world, does it? I mean, I've never heard of it. I can't imagine. I can't think of an example, a real world example, where this is going on. Until 10, 15 minutes ago, Your Honor, I didn't give that particular question much thought. I don't know that it does or does not exist. I hope he doesn't build a class for thinking alone. Well, we – It's hard to give deference to a muddled position anyway. That was not the point I was trying to make, Your Honor. We deferred to muddled. They have a muddled position, and so I don't see how we give deference to it under any standard. Okay. It was not my intention to describe the issue that we're trying to give Chevron deference    I just want to say that it's not that difficult of a question to answer. What I would say about that is it is not the subject of much give and take within the agency itself. It arises out of a Benefits Review Board decision in 1984, and it's been consistently applied ever since. And there is no place where we can go to understand the reasons for it? You could go to the Benefits Review Board decision in Grant v. Portland and determine. But that would deal with the compounding question. And, well, they discuss compound interest in the Santos case, and they reject it. And the director, it may be just a coincidence, but the you could argue that the director's position is consistent with the board's decision in the Grant case. But the director is bound by the board, is he not? He is, but the administrator, the Department of Labor, the Office of Worthless Compensation Programs is fully able to develop rules of its own that may or may not be consistent with what the board held in a given case. The board in that case, simply because there was no rule, there was a gap in the statute insofar as interest is concerned, they stepped in and they made a ruling on that. If the board interprets the statute, can the director, as a matter of internal allocation of power, just agree with it and say, I'm not doing it that way? They could appeal it to a circuit court. Right. But other than that, no, they can't just say, I'm not doing it that way. I think that's true. They could not. Your position is that in Grant there was simple interest, not compound interest? That's correct. And they didn't, I think they went to pains to state that they did not incorporate the statute, section 1621, I don't want to get the numbers wrong here, 6621 is the other statute, the taxpayers, and 28, 1961, is the interest rate. They went to pains to say that they don't incorporate that. They use it for guidance. And since that time, the director has also applied that rule. So one would assume that the one could assume that the guidance comes from that particular decision of the Benefits Review Board. Not the process of an administrative agency. In a lot of cases where you have comment. But if I recall Grant correctly, they don't discuss why. The director does not discuss why? Yes, Grant. Grant does not discuss why they don't compound. That's true. They just do it. So we can't go to Grant and find out the reason.  That's true. There's no discussion of compound in Grant. That's right. Thank you. Thank you, Your Honor. You promised your minutes. Just a few points on rebuttal. In Grant, there was no discussion at all of compound interest. The rate was the Treasury bill rate was around 12 or 13 percent at the time, and there was absolutely no discussion of compound interest. And when the board decided not to have compound interest in the Santos case, I don't think there's any discussion of why they decided not to do that. They just didn't do it. And the position of Mr. Price is that 1961, 28 U.S.C., 1961, does not have to be a prejudgment interest rate, that that rate is not a market rate, that the taxpayer rate is at least has a 3 percent floor on the thing, which is a much fairer way of compensating the disabled worker for the delay in receiving his money than the... You know, I know we've run over time, but all of this seems so terribly artificial. That is to say, imagine he gets an award that should have been awarded back in 1991. And we're trying to figure out, okay, if he had had, say, $1,000 that we're awarding him now, if he'd had that in 1991, and if he'd put it in the bank, what interest would he have gotten during that period? Of course, he's not going to get 12 percent that might have been the interest rate now. He's not going to get the half a percent that might be the interest rate now. He will get a fluctuating interest that runs over the entire period. It might have been 12 percent for a while. It was going to be 6 percent for a while, and back and forth. We're just stabbing in the dark when we choose these things. That's correct. But we have to – but we're just trying to do the best we can to try to make the worker reasonably whole. And the 1961 judgment rate doesn't make him reasonably whole for these past benefits. I think that's – I think that's agreed upon. And also simple interest doesn't make him whole either. Why wouldn't he be entitled at least to the 2004 rate, which is the time at which it was ordered the amount was worth? That's a good point. We've always used it from the date of the first award, but there's no reason why the 2004 rate couldn't have been used for the money from 1991. Of course, the money from 1998 would have been a 2002, I think, benefits review board decision. I think we're trying to just make it relatively simple and not complicated and use it. Well, with the 2000 rate, it wouldn't be 2 percent. It wouldn't be a substantial rate, wouldn't it? Compared to what it is now. But, of course, at the time, the rates were much higher. And Mr. Boyle is not correct. People were getting a lot more than 9 percent on their money in 2000, and the Treasury bill rate was still somewhat deflated. It's a lot more deflated now. Thank you. Thank you. The case is argued in the sense that it was adjourned.
judges: Kozinski, Schroeder, Reinhardt, O'scannlain, Thomas, Silverman, Fletcher, Gould, Berzon, Bea, Murguia, Whyte, O'scannlain, Smith